UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------- X
ANTOINETTE M. COHEN,                    :   **MEMORANDUM**
                                        :   **DECISION AND ORDER**
                            Plaintiff,  :
                                        :   11 Civ. 2624 (BMC)
            -against-                   :
                                        :
MICHAEL J. ASTRUE,                      :
COMISSIONER OF SOCIAL SECURITY          :
                                        :
                            Defendant.  :
                                        :
---------------------------------------------------------------- X

**COGAN**, District Judge.

Pursuant to the Social Security Act, 42 U.S.C. § 405(g), plaintiff brings this action seeking review of the Commissioner of Social Security's denial of her application for disability insurance benefits and Supplemental Security Income. Plaintiff and the Commissioner cross-moved for judgment on the pleadings under Fed. R. Civ. P. 12(c). For the reasons set forth below, plaintiff's motion is granted and the Commissioner's motion is denied.

## BACKGROUND

### I.  Procedural History

Plaintiff filed an application for Social Security disability benefits under Title II, and social security insurance under Title XVI of the Social Security Act. She alleged disability from neuropathy, diabetes, high blood pressure, and arthritis. The Social Security Administration (the "Administration") denied her claim, and plaintiff requested a hearing before an Administrative Law Judge ("ALJ") to contest this determination.

Plaintiff was granted a hearing and appeared with counsel. The ALJ found that plaintiff was not disabled under Sections 216(i) and 223(d), or Section 1613(a)(3)(A), of the Social

Security Act. Plaintiff sought review of the ALJ's decision, which was denied by the Appeals Council. The ALJ's decision thus became the Commissioner's final decision and this action followed.

## II. Non-Medical Evidence

Plaintiff was born in 1951. She has completed two years of college. From 1988 until the alleged onset of her disability on April 27, 2007, she was a token booth worker for the New York City Transit Authority. According to plaintiff, she stopped working because she experienced "tingling sensations" in her hands that interfered with her ability to handle money, sit for long periods of time, and commute to work.

Plaintiff testified before the ALJ that she lives alone and requires her daughter's assistance with daily tasks. Plaintiff claims that her disability precludes working; standing for long periods; participating in hobbies such as crocheting; and walking long distances. According to plaintiff, she experiences difficulty using her hands because of the tingling sensation, notably in such tasks as buttoning her shirts and pants, handling money, washing herself and her clothes, cooking, and cleaning. Plaintiff has reported that she generally leaves the house only for medical care and to shop for groceries. She claims that when she walks, she experiences back and leg pain after half a block despite the assistance of a cane. However, plaintiff has noted that her son or daughter occasionally drive her to visit her son in New Jersey, and plaintiff can travel by subway if necessary. Plaintiff claims that prescribed medicines have not ameliorated her symptoms.

Plaintiff testified that she has a history of alcohol abuse and still drinks alcohol on occasion. She smokes approximately one pack of cigarettes per day.

## III. Medical Evidence

### A. Prior to Alleged Onset of Disability

On November 9, 2005, plaintiff visited Dr. Arshad Mahar at the Family Health Network of Mary Immaculate Hospital, complaining of right knee pain. Dr. Mahar prescribed hydrochlorothiazide for hypertension and Motrin for osteoarthritis. Although plaintiff had a history of hypertension, she was not taking her blood pressure medication at the time of her visit. Plaintiff returned to Dr. Mahar later that month, still complaining of right knee pain. She had not yet filled Dr. Mahar's prescriptions from the November 9th visit. Dr. Mahar noted that he did not find any tenderness, swelling, or limited range of motion in plaintiff's knee. On her follow-up visit with Dr. Mahar, plaintiff indicated that she no longer had pain in her right knee. Dr. Mahar observed that plaintiff's range of motion was normal. He also noted that plaintiff had controlled hypertension, osteoarthritis, high cholesterol, and hypokalemia (potassium deficiency). Dr. Mahar advised plaintiff on healthful dietary changes.

On December 19, 2005, plaintiff returned to the Family Health Network, complaining of left knee pain possibly resulting from a fall. This time, plaintiff saw Dr. Harpreet Singh, who observed swelling in both of plaintiff's knees. Dr. Singh prescribed Motrin for plaintiff's pain. Two days later, plaintiff returned to the Family Health Network to see Dr. Mahar, who increased plaintiff's dosage of Norvasc to better control her hypertension and conducted an electrocardiogram which indicated that plaintiff had an abnormally fast heartbeat.

Later that December, plaintiff returned to the Family Health Network complaining of lower back pain. Dr. Mahar noted that plaintiff had tenderness and a decrease in the range of motion of her back. Dr. Mahar prescribed Diovan in addition to Norvasc to treat hypertension. X-rays of plaintiff's left knee, taken on December 30, 2005, by Dr. Steven Ham were normal.

On January 3, 2006, plaintiff returned to the Family Health Network and saw Dr. Marina Ivanyuk. There, plaintiff indicated that her knee pain had subsided. Dr. Ivanyuk observed that plaintiff was noncompliant in taking blood pressure medications and suggested the possibility of alcohol abuse.

On May 2, 2006, plaintiff saw Dr. Traceyan Reid at the Family Health Network and complained of swelling in her right great toe and left knee pain. Plaintiff described a history of alcohol abuse, but said she had not consumed alcohol within the past week. Dr. Reid found tenderness and swelling in plaintiff's toe and prescribed Indomethacin, Os-Cal, and Arthrotec to treat her osteoarthritis. Dr. Reid noted that plaintiff's hypertension was not controlled, likely due to plaintiff's non-compliance with her medical regimen, and advised plaintiff to restart Diovan and Norvasc.

Five months later, plaintiff returned to the Family Health Network complaining of right foot swelling. She was seen by Dr. Luella Lewis. Dr. Lewis noted that plaintiff had been consuming alcohol and not taking her medication. Dr. Lewis added Toprol to plaintiff's anti-hypertension regimen. On a follow-up visit on February 7, 2007, plaintiff reported no chest pain, no dizziness, nor palpitations; Dr. Lewis increased plaintiff's Toprol dosage.

In a follow-up visit to check plaintiff's blood pressure, plaintiff returned to the Family Health Network to see Dr. Daniel Constandse. Dr. Constandse diagnosed uncontrolled hypertension as well as plaintiff's questionable compliance with her treatment regimen, and readjusted her hypertension medications. He suggested plaintiff return for a checkup in two weeks.

On March 17, 2007, plaintiff went to the emergency room after falling down the stairs and fracturing two ribs. She saw Dr. Andrey Kucherina of the Family Health Network three

days later, complaining of chest pain resulting from the fall. Dr. Kucherina noted tenderness in plaintiff's ribs, but found that her hypertension had stabilized. On a follow-up visit later that month, plaintiff indicated that her chest pain had improved yet still lingered. At the time of her visit, plaintiff had not taken her blood pressure medication for two days. Dr. Kucherina suggested that plaintiff's hypertension was uncontrolled due to non-compliance with medication.

On April 25, 2007, plaintiff saw Dr. Joanne Dempster of the Family Health Network, citing numbness in her fingers, general weakness, and loss of balance. Plaintiff claimed that her pain score was "ten" on a ten-point scale, with ten representing the highest amount of pain. Dr. Dempster diagnosed tingling and numbness, likely resulting from alcoholism-induced nerve damage. Plaintiff was non-compliant with her hypertension medication at the time.

### B. On and After Alleged Onset of Disability

After receiving plaintiff's lab work results, Dr. Childebert St. Louis of the Family Health Network called plaintiff on April 26, 2007, and instructed her to come to the clinic or emergency room as soon as possible to treat her abnormal potassium level. Plaintiff attended the Family Health Network the next day, where her electrocardiogram test was abnormal. She was sent to the emergency room later that day to treat low potassium, weakness, and tingling in her feet. Plaintiff's chest X-ray did not show any acute illness but her electrocardiogram remained abnormal. She was discharged on April 30, 2007, after being diagnosed with low potassium secondary to alcohol abuse. She was prescribed five medications to treat hypertension and arthritis.

From May to September, 2007, plaintiff saw several other doctors at the Family Health Network. Plaintiff's visits were prompted by tingling, numbness in her extremities, and difficulty walking. Plaintiff relayed a pain score of "ten" to Dr. Shantie Harkisoon in May and a

score of "six" to Dr. Hamid Akbarian in June. She was diagnosed with Type II Diabetes during this period, which affected her vision. A CT-scan of plaintiff's brain on June 21, 2007, illustrated small lesions on the brain, and a July 9, 2007, electromyogram revealed mild to moderate nerve damage. She reported a pain score of "zero" to Dr. Chava on July 10, 2007, but a score of "ten" on July 13, 2007. Plaintiff also saw Dr. St. Louis on August 22, 2007, who diagnosed diabetic neuropathy with ataxic gait. Plaintiff saw Dr. Fredrick Lambert on September 25, 2007, who diagnosed alcoholic neuropathy. Throughout these months, plaintiff was observed to be repeatedly non-compliant with her medical regimen. Doctors also noted her history of alcohol abuse as potentially related to her health issues.

In November of 2007, plaintiff returned to Dr. St. Louis to obtain medical clearance for a cataract extraction to take place the next day. Plaintiff indicated a pain score of "zero." Dr. St. Louis observed that plaintiff's control of her diabetes had improved and that her hypertension was stable. He approved surgery. An electrocardiogram conducted that day showed that plaintiff had a slowed heart rate, but was otherwise normal. After plaintiff's eye surgery, she returned to Dr. St. Louis on January 7, 2008, for a check-up. Dr. St. Louis's medical conclusions remained the same.

In February of 2008, plaintiff saw Dr. Luke Han. Dr. Han, evaluating plaintiff on behalf of the Administration, diagnosed obesity, hypertension, diabetes, diabetic neuropathy, and osteoarthritis of the knee. He believed that plaintiff had only moderate restrictions for walking, standing, or climbing. Plaintiff saw Dr. Anet Benamin for an ophthalmologic examination on March 3, 2008. Dr. Benamin, also on behalf of the Administration, observed that plaintiff's eyes were healing from her eye surgery, and opined that plaintiff was not visually disabled. He diagnosed bilateral refractive error, treated diabetic retinopathy, and pseudophakia.

Ten days later, plaintiff saw Dr. Daniel Rubin at the Queens Long Island Medical Group, complaining of burning in her feet and hands. Dr. Rubin increased plaintiff's Gabapentin prescription, discontinued Cymbalta, and recommended that plaintiff stop smoking.

On May 7, 2008, plaintiff returned to Dr. St. Louis, who completed a multiple impairment questionnaire. Dr. St. Louis wrote that plaintiff could likely sit for three hours per day, stand for one hour per day, and occasionally lift objects up to five pounds. Dr. St. Louis also noted that plaintiff would have trouble manipulating small objects and should avoid wetness, fumes, dust, and gases, estimating that plaintiff would likely miss work more than three days per month.

On June 11, 2008, plaintiff went to the St. Dominic Clinic, complaining of left shoulder pain. Plaintiff underwent physical therapy with Dr. Ida Tetro from December 16, 2008, until May 19, 2009, attending eighteen sessions. Dr. Tetro diagnosed plaintiff with degenerative joint disease in her left shoulder. On February 24, 2009, plaintiff, still complaining of left shoulder pain, again saw Dr. Tetro. Dr. Tetro diagnosed coronary artery disease and diabetes mellitus, prescribing Plavix, Vasotec, and Lyrica. In letters dated May 28 and June 4, 2009, Dr. Tetro wrote that plaintiff had severe neuropathy caused by several factors, including alcohol abuse and diabetes; that the damage was permanent and would not improve regardless of plaintiff's abstention from alcohol; and that in her medical opinion, plaintiff was completely disabled.

## IV.  The ALJ's Determination

The ALJ found that plaintiff was not disabled as defined under the Social Security Act. Consistent with the Social Security Act, the ALJ evaluated plaintiff's claim under a five-step analysis.

At the first step, the ALJ found that plaintiff satisfied the insurance requirements in the Social Security Act. At the second step, the ALJ found that plaintiff had not engaged in any

7

gainful employment since the alleged onset of her disability on April 28, 2007. At the third step, the ALJ found that plaintiff had severe, medically-determinable impairments which hindered her ability to work. Plaintiff's impairments were listed as: non-insulin dependent diabetes mellitus with diabetic neuropathy, essential hypertension, osteoarthritis of the knees, degenerative joint disease in the lumbar spine, a left shoulder derangement, obesity, and alcohol abuse.

At the fourth step, the ALJ found that plaintiff's disability did not meet requisite impairment criteria. The ALJ explained that there was "no evidence . . . of a major weight bearing joint in the knees resulting in the inability to effectively ambulate." The ALJ also indicated that the medical record did not establish that plaintiff's impairments matched the criteria for those listed under 20 CFR Part 404, Subpart P, Appendix 1. At the fifth step, the ALJ found that plaintiff maintains the residual capacity to perform "sedentary work," including her previous job as a token booth operator.

## DISCUSSION

42 U.S.C. §§ 423(d) and 1382(c) mandate that benefits are available to anyone deemed "disabled." The statute defines "disabled" as "unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The "impairment" must stem from "anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic technique." 42 U.S.C. § 1382c(a)(3)(D). The claimant holds the burden of proving disability, but once she has established a prima facie case, the Commissioner must show that there is work in the national economy that the claimant could still perform. See Mimms v. Heckler, 750 F.2d 180, 185 (2d Cir. 1984).

The Commissioner uses a five-step procedure to evaluate a claimant's application for benefits. At step one, the Commissioner inquires whether a claimant was performing substantial gainful activity at the time he or she filed for benefits. See 20 C.F.R. §§ 404.1520(b), 416.920(b). At step two, the Commissioner inquires whether the claimant has any "severe impairments" precluding claimant's ability to work. See 20 C.F.R. §§ 404.1520(c), 416.920(c). At step three, the Commissioner inquires whether the disability meets the criteria for impairment listed in Appendix 1 to 20 C.F.R. Part 404, Subpart P. See 20 C.F.R. §§ 404.1520(d), 416.920(d). Step four requires comparing the claimant's residual functional capacity to the demands of his or her work prior to filing for benefits. See 20 C.F.R. §§ 404.1520(e), 416.920(e). Lastly, if the Commissioner determines that the claimant is no longer able to perform the job she had prior to filing for benefits, the Commissioner moves on to step five. At this step, the Commissioner determines whether there is any other work that the plaintiff can perform. See 20 C.F.R. §§ 404.1520(f), 416.920(f).

A court will affirm an ALJ's decision if it is supported by substantial evidence. Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206 (1938).

## I. Treating Physician Rule

In assessing conflicting medical evidence, the ALJ must grant a treating physician's opinion "controlling weight," provided that it is well supported by medically acceptable diagnostic techniques and not inconsistent with the other evidence in the record. 20 C.F.R. § 416.927(d)(2). This rule is known as the "treating physician rule." Id. at § 423(d)(2)(A). A treating physician is defined by the statute as a medical professional who can "provide a detailed

longitudinal picture" of a plaintiff's condition. Id. A treating physician's lack of supporting clinical findings does not render his opinion entirely void and undeserving of "at least some weight." Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998). Conversely, a consulting doctor's opinions and reports "should be given limited weight . . . because consultative exams are often brief and generally performed without benefit or review of claimant's medical history." Cruz v. Sullivan, 912 F.2d 8, 13 (2d Cir. 1990) (quoting Torres v. Bowen, 700 F. Supp. 1306, 1312 (S.D.N.Y. 1988)).

An ALJ need not grant controlling weight to a treating physician's opinion that is contradicted "by other substantial evidence in the record." Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002). In such situations, the ALJ is required to "comprehensively set forth reasons for the weight assigned to [the] treating physician's opinion." Ramirez v. Astrue, No. 10-CV-03522, 2012 WL 372011, *17 (E.D.N.Y. Feb. 3, 2012) (quoting Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir. 2004)). The Second Circuit has noted that an ALJ's failure to adequately support his decision of not giving a treating physician's opinion controlling weight is proper grounds for remand. See Halloran, 363 F.3d at 33. The factors that the ALJ must consider are:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

Id. at 32.

Here, plaintiff has two treating physicians: Dr. St. Louis and Dr. Tetro. Dr. St. Louis indicated that plaintiff could only sit for three hours per day, stand for one hour per day, and that plaintiff would have difficulty manipulating small objects. Dr. Tetro found plaintiff to be totally

disabled. In concluding that plaintiff was not disabled and could return to her previous work as a toll booth worker, where she could sit for at least six hours per day, the ALJ afforded "no weight" to Dr. Tetro's opinion and "little weight" to that of Dr. St. Louis. The ALJ made three arguments to support his decision to depart from these treating physicians' medical assessments.

First, the ALJ claimed that Dr. St. Louis's findings were entitled to "little weight" because they were contradicted by substantial evidence in the record. For example, the ALJ premised his finding that plaintiff is not disabled in part on a determination that Dr. St. Louis's arthritis diagnosis was not entitled to deference. The ALJ contended that "there is little diagnostic support for the alleged arthritis" because the MRI taken on December 30, 2005, by Dr. Ham, was negative. Despite the results of this single MRI, plaintiff was also diagnosed with arthritis by the independent medical examiner, Dr. Han. Moreover, the MRI cited by the ALJ occurred over one year prior to the date plaintiff claimed disability and more than two years prior to Dr. Han's determination that plaintiff suffers from arthritis. Considering the medical consensus between Dr. Han and Dr. St. Louis, this single, out-dated MRI does not constitute "substantial evidence" warranting departure from the treating physician rule. See Consol. Edison Co., 305 U.S. at 229. The ALJ therefore should have deferred to Dr. St. Louis's arthritis diagnosis.

The ALJ also reasoned that Dr. St. Louis's opinion regarding plaintiff's limitations was "inconsistent with the mild to moderate findings on the EMG/NCV he cited in support of his conclusions." However, this "mild to moderate" characterization is not that of Dr. St. Louis; it is a remark of the technician who performed the test that the ALJ has taken out of context. It is axiomatic that the ALJ may not "substitute his own expertise or view of the medical proof for the treating physician's opinion." Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000). The ALJ

therefore was not entitled to disregard Dr. St. Louis's opinions in favor of the ALJ's own interpretation of these specialized nerve tests.

Aside from Dr. St. Louis's arthritis diagnosis and his reliance on the EMG/NCV, the ALJ did not explain which elements of Dr. St. Louis's opinion were allegedly contradicted by the rest of the record. However, the ALJ accepted Dr. Han's medical conclusions regarding the severity of plaintiff's symptoms over the opinion of Dr. St. Louis. An ALJ is generally permitted to consider the medical assessments of an examining, consultative physician when determining whether a treating physician's opinion is consistent with substantial evidence in the record. See, e.g., Diaz v. Shalala, 59 F.3d 307, 315 (2d Cir. 1995). However, reports of one-time consultative examiners such as Dr. Han should generally be given less weight because they lack the "unique perspective to the medical evidence that a treating physician's opinion would provide." Goldthrite v. Astrue, 535 F. Supp. 2d 329, 336 (W.D.N.Y. 2008). At the very least, the ALJ was obligated to explain why Dr. Han's opinion was entitled to more deference than the opinions of Dr. St. Louis's, which were formed over multiple visits with the plaintiff over several months. See, e.g., Lawler v. Astrue, No. 10-CV-3397, 2011 WL 5825781, at *8 (E.D.N.Y. Nov. 14, 2011) ("That the one-time consultative examiner simply disagreed with the treating physicians does not provide a good enough reason for rejecting the treating physicians' conclusions.").

Second, the ALJ argued that Dr. St. Louis's opinion was not entitled to deference because it was "sanitized of any reference to the claimant's obvious compliance issues . . . and her continued abuse of alcohol." The ALJ believed that plaintiff's non-compliance and abuse of alcohol were pertinent because he found that her "conditions appear to have been exacerbated and even caused by non-compliance with treatment regimens as well as alcohol and tobacco abuse that continued despite recommendations that she stop." The ALJ contended that despite

the assessments of Dr. St. Louis and Dr. Tetro, plaintiff's symptoms are a product of her lifestyle choices, and would abate should her behaviors change.

The fact that Dr. St. Louis's report did not discuss plaintiff's non-compliance or her alcohol abuse is not a valid reason for the ALJ to have afforded his opinion little weight. This justification has nothing to do with the factors – set forth in the Second Circuit's decision in Halloran – that an ALJ may appropriately consider when determining whether a treating physician's opinion is entitled to controlling weight. To the extent that the ALJ was intimating that Dr. St. Louis's findings were contradicted by record evidence of plaintiff's alcohol dependency – which, if true, would be an appropriate consideration under Halloran – there is nothing in Dr. St. Louis's report that is inconsistent with the evidence of plaintiff's alcohol abuse. Furthermore, there is nothing in Dr. St. Louis's report to indicate that he intentionally "sanitized" the report of references to non-compliance and alcohol abuse, rather than simply excluding this information because Dr. St. Louis did not deem it to be relevant.

In any event, plaintiff's history of substance abuse should not necessarily preclude a finding that she is disabled. An ALJ can only use substance abuse to deny benefits if the plaintiff would no longer remain disabled should she stop abusing drugs or alcohol. See Mitchell v. Astrue, No 07-CV-285, 2009 WL 3096717, at *18 (S.D.N.Y. Sept. 28, 2009) (citing 20 C.F.R. §§ 404.1535, 416.935). Dr. Tetro indicated in a letter that, in her professional opinion, plaintiff's medical conditions would not improve regardless of plaintiff's reduction in alcohol consumption. Moreover, plaintiff has reported a significant reduction in alcohol consumption leading up to her administrative hearing, and there has been no corresponding reduction in symptoms. The ALJ therefore was not entitled to reject Dr. Tetro's conclusion that plaintiff's symptoms would persist despite a cessation of alcohol use, and the ALJ provided no reasons for doing so. See generally

Filocomo v. Chater, 944 F. Supp. 165, 170 (E.D.N.Y. 1996) ("In the absence of supporting expert medical opinion, the ALJ should not have engaged in his own evaluations of the medical findings.").

Finally, the ALJ discredited Dr. St. Louis's findings by arguing that Dr. St. Louis's report was "largely based on the claimant's subjective complaints, which the undersigned finds not to be credible." However, to say that Dr. St. Louis's report is "largely based on the claimant's subjective complaints" is a mischaracterization. As Dr. St. Louis noted, his diagnoses were based on, *inter alia*, the results of an EMG/NCV, MRI findings of infarcts in the brain, and ECM findings of neuropathy. These tests are objective measures rather than subjective complaints.

Since the ALJ failed to provide good reasons for disregarding the opinion of Dr. St. Louis, remand is appropriate. See Halloran, 636 F.3d at 33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physicians opinion . . . .").

## II. Duty to Develop the Record

The ALJ has an affirmative duty to develop a complete medical record before making a disability determination, in light of the non-adversarial nature of benefits proceedings. See Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008); Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999); Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996). When the ALJ receives evidence from a claimant, either from a treating physician or another source, that is inadequate to support a disability determination, the ALJ must "recontact [claimant's] treating physician . . . or other medical source to determine whether the additional information [the Administration needs] is readily available." C.F.R. § 404.1512(e). However, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the

14

ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." Rosa v. Callahan, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (quoting Perez, 77 F.3d at 47). A court will remand when the administrative record has not been fully developed. See Butts v. Barnhart, 388 F.3d 377, 385 (2d Cir. 2004).

Here, the ALJ reasoned that Dr. Tetro's opinion was not entitled to any weight in part because her records "do not contain much by way of actual clinical examination findings." The ALJ further wrote that Dr. Tetro's records "contain the report of only one stress test, which was equivocal for mild stress." The ALJ relied on the results of this test to argue that Dr. Tetro's diagnoses were at odds with the rest of the medical record, and that the results of Dr. Tetro's prescribed tests indicate that plaintiff has mild symptoms. The content of Dr. Tetro's notes is critical to plaintiff's case because Dr. Tetro's diagnoses of severe neuropathy, coronary artery disease, and diabetes mellitus, as well as her medical opinion that plaintiff was completely disabled, are important evidence for plaintiff's case.

I find Dr. Tetro's handwriting to be completely illegible.[1] It is therefore impossible to determine how the ALJ formulated his opinion regarding Dr. Tetro's records. The illegibility of Dr. Tetro's notes constitutes an obvious gap in the record that the ALJ should have cured. Additionally, the Second Circuit has held that illegible records "warrant a remand for clarification and supplementation," and should not be held against a claimant. Cutler v. Weinberger, 516 F.2d 1282, 1285 (2d Cir. 1975).

## III. Plaintiff's Credibility

In determining a claimant's residual functional capacity, the ALJ must take into consideration the claimant's subjective account of his symptoms and limitations, "to the extent

---

[1] Dr. Tetro's letter referenced in the section of this opinion regarding the treating physician rule was typed and clearly legible.

15

that they are consistent with objective medical evidence and other evidence." Alcantara v. Astrue, 667 F. Supp. 2d 262, 276 (S.D.N.Y. 2009) (citing §§ 404.1520(a)(4)(i), (e)-(f); 404.1560(b)(2)). A court will affirm the ALJ's discounting of a claimant's subjective complaints if "substantial evidence support[ed] [his] determination." Longbardi v. Astrue, No. 07-CV-5952, 2009 WL 50140, at *32 (S.D.N.Y. Jan. 7, 2009). If the ALJ fails to adequately explain his finding that the claimant was not entirely credible, remand is appropriate. See Ramirez, 2012 WL 372011, at *23.

When explaining a finding that plaintiff's testimony is not credible, the ALJ must "show specific cause, grounded in evidence, for his or her conclusion," Snyder v. Barnhart, 323 F. Supp. 2d 542, 547 (S.D.N.Y. 2004), and must set forth his conclusion "with sufficient specificity to permit intelligible plenary review of the record." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988). If the ALJ's reasoning was not set forth with this level of specificity, remand is required. See, e.g., Eschmann v. Astrue, No. 09-CV-1325, 2011 WL 1870294, at *16 (E.D.N.Y. May 16, 2011).

Here, the ALJ found that plaintiff's testimony regarding the severity of her symptoms was "not generally credible." In explaining this finding, the ALJ reasoned that plaintiff was not credible because she has "undermined her own treatment" through non-compliance and alcoholism; has "caused" her peripheral neuropathy through alcohol abuse; "continues to smoke, contrary to her doctor's advice"; because she attributed her use of a cane to her back condition, which the ALJ found to be "diagnostically speaking . . . not that impressive"; and because "she takes no pain medication for her alleged orthopedic impairments which purportedly contribute to her work-related limitations."

16

The ALJ's explanations for discounting plaintiff's testimony do not meet the Second Circuit's standard of specificity. His opinion that plaintiff's back condition was "not that impressive" is vague and inadequately explained, and does not allow this Court to determine whether plaintiff's testimony truly ran counter to the objective medical evidence regarding her back. Similarly, the ALJ did not explain how plaintiff's abuse of alcohol and decision to smoke cigarettes speaks to her credibility. The ALJ did not claim that plaintiff was dishonest about these addictions, and in fact the record shows that plaintiff admitted to the ALJ, at the hearing, that she still smokes and that she continues to occasionally drink alcohol – on holidays and special occasions – despite her doctors' recommendations that she stop. The mere fact that a person struggles with addiction does not speak to her character for truthfulness.

It also does not necessarily follow that a plaintiff who is non-compliant with treatment recommendations is not actually in pain. The Administration has recognized that non-compliance can speak to credibility in some instances, and has issued a ruling that explains how an ALJ may treat non-compliance when considering whether a plaintiff is telling the truth. According to Social Security Ruling 96-7p,

> the adjudicator must not draw any [credibility] inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide . . . that may explain . . . failure to seek medical treatment. The adjudicator may need to recontact the individual or question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner.

Accord id.; Smith v. Astrue, No. 09-CV-470, 2011 WL 6739509, at *4-*6 (N.D.N.Y. 2011) (remanding based on ALJ's failure to seek and consider plaintiff's explanations as to why she was non-compliant with treatment).

17

Although the ALJ in this case noted that plaintiff's non-compliance was "not the basis for [his] decision," but merely one factor, he was still obligated to consider whether plaintiff had good reasons for her non-compliance. In any event, despite the ALJ's claim that plaintiff's non-compliance and alcohol abuse were only two factors of many that he considered, his fixation on these factors in his opinion and during the administrative hearing belies this assertion. Remand is therefore warranted for the ALJ to consider plaintiff's reasons for non-compliance and adequately explain how plaintiff's non-compliance, alcohol usage, and cigarette smoking impacted the ALJ's credibility determination.

## CONCLUSION

For the foregoing reasons, the Commissioner's [12] motion for judgment on the pleadings is denied and plaintiff's [8] motion is granted. This case is remanded to the Commissioner for further administrative proceedings consistent with this decision.

**SO ORDERED.**

s/ BMC
U.S.D.J.

Dated: Brooklyn, New York
August 6, 2012